# EXHIBIT C

STATE OF NEW YORK
STATE EDUCATION DEPARTMENT
-----------------------------------------------------------------X
In the Matter of the Application of Anton Pshenichnykh,
an infant under the age of fourteen years, by his father
and natural guardian, DMITRY PSHENICHNYKH,
and Anton, individually,

Petitioners

from the action of
THE BOARD OF EDUCATION OF
THE EAST MEADOW UNION FREE SCHOOL DISTRICT,

Respondents

regarding the Short and Long-Term Suspensions Imposed
on Anton Under Section 3214 of the Education Law
-----------------------------------------------------------------X



**NOTICE OF
PETITION**

**NOTICE:**

You are hereby required to appear in this appeal and to answer the allegations contained in
this petition. Your answer must conform with the provisions of the regulations of the
Commissioner of Education relating to appeals before the Commissioner of Education,
copies of which are available at www.counsel.nysed.gov or from the Office of Counsel,
New York State Education Department, State Education Building, Albany, NY 12234.

If an answer is not served and filed in accordance with the provisions of such rules, the
statements contained in the petition will be deemed true statements, and a decision will be
rendered thereon by the Commissioner.

Please take notice that such rules require that an answer to the petition must be served
upon the petitioner, or if the petitioner be represented by counsel, upon the counsel, within
20 days after the service of the appeal, and that a copy of such answer must, within five
days after such service, be filed with the Office of Counsel, New York State Education
Department, State Education Building, Albany, NY, 12234.

Please take further notice that the within petition contains an application for a stay order.
Affidavits in opposition to the application for a stay must be served on all other parties
and filed with the Office of Counsel within three (3) business days after service of the
petition.

/x/ Suzanne Myron
Suzanne Myron, Esq.
*Attorney for Petitioners*

ANTON and DMITRY
PSHENICHNYKH
The Law Office of Suzanne Myron
6800 Jericho Turnpike  Suite 120W
Syosset, NY 11791
(516) 393-5821

TO:

Kenneth Card
Superintendent
on behalf of
East Meadow Union Free School District
718 The Plain Road
Westbury, NY  11590

Office of Counsel
New York State Education Department
State Education Building
89 Washington Avenue
Albany, NY 12234

STATE OF NEW YORK
STATE EDUCATION DEPARTMENT
-------------------------------------------------------------------X
In the Matter of the Application of A.P,
an infant under the age of fourteen years, by his father
and natural guardian, DMITRY PSHENICHNYKH,
and Anton, individually,

from the action of
THE BOARD OF EDUCATION OF
THE EAST MEADOW UNION FREE SCHOOL DISTRICT,

Respondents

regarding the Short and Long-Term Suspensions Imposed
on Anton Under Section 3214 of the Education Law
-------------------------------------------------------------X

**VERIFIED
PETITION
AND
APPLICATION
FOR STAY ORDER**

TO THE COMMISSIONER OF EDUCATION:

## SUMMARY

1.  This action is brought under Article 7 §310 and Article 7 §311.2 of the Education Law. Anton, one of the above two petitioners, is a 12-year-old 7th grade student at W.T. Clarke Middle School ("Clarke Middle School"), in East Meadow, New York. The school is part of the East Meadow Union Free School District ("East Meadow District" or "District"). His father is Dmitry Pshenichnykh ("Dmitry"), the second of the petitioners in this case. Anton speaks three languages and likes art. Anton has a close relationship with his father.

2.  This action appeals both the short-term and long-term suspensions imposed by the District after a superintendent's hearing. There are no clear rules on appealing

short term suspensions in the East Meadow District. In fact, the District's Code of Conduct Section 5305, as well as its Board Policy 5313.3 entitled "Student_Suspension" says nothing about HOW to appeal the suspensions. These policies are attached herein to the Affidavit of Dmitry Pshenichnykh (hereinafter "Dmitry Affidavit") as "EXH. M" and "EXH. S". This issue was raised in our appeal to the board, which was recently denied. (Dmitry Affidavit, Exh T: Board Appeal dated June 29, 2023 ["EXH. T"], Exh. U: Appeal Denial dated August 4, 2023 ["EXH. U"])

3. For reasons which are summarized here, and in more detail in Dmitry's affidavit, **Anton and Dmitry are asking your honor to issue a stay order under 8 NYCRR §276.1, requiring the East Meadow District to immediately overturn and expunge Anton's record in regards to the short term and long term suspensions. We also request that the commissioner find that Anton was bullied under the Dignity for All Students Act (DASA), for reasons which will be outlined in full below. Finally, we seek an appeal of the family's intradistrict transfer request in light of the events that took place on April 19, 2023. Please refer to our memorandum of law (attached) for legal reasoning.**

### FACTS

4. Dmitry is a single father with primary custody of Anton  Dmitry and Anton suffered hardships due to the fact Dmitry was unable to find sufficient work as a driver for Uber, Lyft or Doordash in the years 2020 through 2022—work which prior to the pandemic provided a consistent paycheck. (Dmitry Affidavit, P. 2 ¶¶ 4-6) In addition, they lost their in-district apartment. (Dmitry Affidavit, P. 2 ¶4)

Anton continues to attend Clarke Middle School under the McKinney-Vento Act while they live in temporary housing in Hempstead. (Dmitry Affidavit, P. 2, ¶4)

5.  Anton and his father were denied an informal conference with Principal Stacy Breslin ("Breslin") both before and after imposition of Anton's short-term suspension. (Dmitry Affidavit, P. 3 ¶10; Exh. K: Transcript of Superintendent's Hearing Held on May 9, 2023, P. 14 ["EXH. K"]) Anton was originally charged with "possessing a weapon, displaying what appears to be a weapon, threatening to use any weapon", a charge the staff *knew* had no basis in fact. (Dmitry Affidavit, Exh. D: Short Term Suspension Notice Letter dated April 19, 2023 ["EXH. D"] and Dmitry Affidavit, Exh. E: Short Term Suspension Decision Letter dated April 19, 2023 ["EXH. E"]). This is clear because the letters were given out at the same time on the same day, April 19, 2023, by Assistant Principal, Linda Lynch ("Lynch"), when Dmitry came to pick up Anton and was met by police. (Dmitry Affidavit, P. 3, ¶10; EXHS. D-E; Exh. A: Transcript of Anton's Superintendent's Hearing held on May 15, 2023, P. 32 ["EXH. A"])

6.  Lynch also called the Nassau County police ("NCPD") prior to any determination as to whether the above charge regarding Anton's possession of a gun was true. (Dmitry Affidavit, EXH. K, pp. 18-19) In fact, the principal, assistant principal and dean based their decision on a "hunch" they had after a student, J.M., who was himself on the way to detention at the time, allegedly told Dean Gustavo Loor ("Loor") that Anton said: "There will be a school shooting tomorrow. I got that strap on me". (Dmitry Affidavit, EXH. A, P.3). This statement was later listed as a charge on the superintendent's hearing notice letter, but never made it onto the

3

short term notice or decision letters.     (Dmitry Affidavit, EXHS. D-E, Exh. G: Superintendent's Hearing Notice Letter dated April 20, 2023 ["EXH. G"]))

7. Without any further investigation other than an interview with Anton conducted by Loor which took place in Loor's office and without anyone else present, Loor conducted a search of Anton's backpack and a search of his person.  (Dmitry Affidavit, EXH. A, P. 5, P. 6)  He was also interviewed by the police ambulance person, apparently at the directive of the Department of Homeland Security ("DHS"), both at the school and in the ambulance. Dmitry Affidavit, EXH. A, P. 16, pp. 25-27  This was frightening for Anton, who texted his father that he was sorry for saying the words "school shooting" and that they were searching his backpack (Dmitry Affidavit, EXH. A, pp. 25-26; Exh. B: Text Message dated April 19, 2023 ["EXH. B").  Then, Anton was taken to a hospital by the NCPD where he was held for several hours before being released with a clean bill of health.  (Dmitry Affidavit, P. 3 ¶10, P. 4 ¶¶13-14; EXH. A, pp. 31-35)

8. While this was happening, his father was barred from seeing his son, and forced to consent to a search of the home which took place while he was at the hospital waiting for Anton to be released. (Dmitry Affidavit, pp. 3-4, ¶9, ¶10, ¶13, ¶14; EXH. A, pp. 31-35)

9. Finally, although Loor tried to backtrack on what he said during cross-examination, he admitted that he knew that Anton's health data was also given to the police, ambulance personnel and the DHS without Dmitry present and without his parents' permission. (Dmitry Affidavit, EXH. A, pp. 8-18) During the hearing, Loor confessed that the results of the search of the family's home were "reported

back" to the school by police, violating the family's right to privacy. (Dmitry Affidavit, EXH. A., P. 7, P. 10) Loor also admitted the school knew this would happen when Anton was arrested. (Dmitry Affidavit, EXH. A., P. 7, P. 10)

10. Like the April 19, 2023 letters, the notice letter for the superintendent's hearing was rushed out on April 20, 2023, without adequate investigation. This is clear because the April 20, 2023 letter suddenly dropped, without explanation, the charges from the short term suspension notice, and the decision letters relating to possession or displaying a weapon. (Dmitry Affidavit, EXH. G; EXHS. D-E)

11. Dmitry knew that his family's rights had been intentionally violated. After over a month of attempting to find a pro bono attorney to take his case, during which time Dmitry was forced to stay home with Anton for the better part of the day, Dmitry found Suzanne Myron. (Dmitry Affidavit, pp 4-5, ¶15) To do otherwise would have been to violate shelter policies on leaving children alone. (Dmitry Affidavit, P. 2, ¶7)

12. However, the rescheduled hearing date and time of May 9, 2023 at 1:30 p.m. was continued to a second day, May 15, 2023, due to lollygagging by school personnel. The District's justification was that the family's counsel didn't request that Loor appear as the family's witness for the first part of the hearing and that Loor had gone home by the time it was the family's turn to present their case. (Dmitry Affidavit, P. 5, ¶17; EXH. K, pp. 20-23; EXH. A, P. 1)

13. District counsel, Michael Raniere, freely admitted that Loor was unavailable on May 9 at 4 p.m., but Petitioner's counsel requested to speak to Loor several times earlier that day, where it is assumed he was available as both of the other

administrators were at the hearing and someone should have been overseeing operations while they were busy (Dmitry Affidavit, EXH. K, P. 7, pp. 20-21). It was not apparent until the District had nearly concluded its case that Loor was the *only* administrator who spoke to the *only* eyewitness, J.M. (EXH. K, P. 7, pp. 20-21)

14. The District created the need to continue the hearing to a second day by delaying the start of the hearing an hour, until 2:30 p.m., for no apparent reason, while the family sat waiting nervously in the conference room, during which time Dmitry lost even more time from work. (Dmitry Affidavit, P. 5, ¶17; EXH. K, pp. 20-23; EXH. A, P. 1)  It is ironic that Loor, who, as dean, typically interviews students during disciplinary investigations, was able to leave so early he missed the entirety of A.P's 3214 hearing, which began at 1:30 pm, while the District requires the attendance of parents and students to be disciplined.  No such regard for Dmitry's needs or work schedule was given.

15. During the hearing, J.M., the sole first-person witness to Anton's alleged comment, failed to appear. J.M. was never confronted about his claims nor was he ever cross examined by the family.  (Dmitry Affidavit, EXHS. A and K)

16. After the second day of the hearing, which took place on May 15, Anton was found guilty under the Section 3214 (3)(a) "catch-all" provision related to garden variety threats to "safety, … health and welfare of others" because, according to Superintendent Kenneth Card ("Card"), Anton himself admitted he said the words "to the effect of 'school shooting' ".  (Dmitry Affidavit, Exh. I: Superintendent's Hearing Decision Letter dated May 16, 2023 ["EXH. I"] and EXH. A, P. 42) In

6

spite of the fact Anton had already been out of school nearly a month, Card suspended Anton for the rest of the school year. (*Id.*) The family filed an appeal to the board on June 29, 2023 which resulted in a denial of their appeal, issued on August 7, 2023. (Dmitry Affidavit, P. 8, ¶27; Exh. T: Appeal Denial Letter dated August 4, 2023)

17. After the hearing was over, J.M. somehow obtained Anton's phone number and began texting him, repeating his name over and over more than two hundred times. (Dmitry Affidavit, Exh. C: Email Exchange dated May 19 to 22, 2023 {"EXH. C"}) J.M. also sent a cryptic message that mentioned "death", and could be interpreted as a violent threat. (EXH. C) When Dmitry texted back that he wanted J.M. to stop contacting Anton, J.M. responded "no" before erasing his response. (EXH. C) Although Dmitry immediately complained in writing to Loor, Loor made excuses for the behavior, saying that J.M. had contacted Anton as a concerned friend, in spite of the fact that Anton and the District admitted that they knew J.M. had never been Anton's friend. (Dmitry Affidavit, EXH. C; EXH. K, P. 14, P. 18; EXH. A, P. 20, P. 29) Loor also failed to forward Dmitry a DASA complaint form, forcing Dmitry to file a complaint on his own to building coordinator Lynch, the assistant principal, who never issued any decision. (Dmitry Affidavit, Exh. L: DASA Complaint dated June 6, 2023 ["EXH. L"]) Because no decision was issued with appeal rights, and no District coordinator was listed on the form, Petitioners appeal directly to the commissioner.

## ARGUMENTS

18. Dmitry now seeks an expungement of Anton's record based upon the fact the family requested an intradistrict transfer for Anton (**He wants his son to start 7th Grade without fear of being targeted by the staff or other students and with a proper anecdotal record. Since it is already mid-August, it is for these important reasons the family is asking for a stay to be issued immediately. In addition, we are requesting that the DASA complaint be deemed founded and the intradistrict transfer ordered by the Commissioner.**

19. As outlined in our memorandum of law, not only are the school's actions illegal under the Education Law Section 3214(3)(a), as well as the school's own rules, the school's actions are unconstitutional under the First, Fourth and Fourteenth Amendments of the United States constitution as interpreted by the Supreme Court in *Goss v. Lopez*. See 419 US 465 (1975). In addition, the bullying by J.M. and District staff, who refused to do anything about J.M.'s behavior, the accusations that Anton did something he did not do, resulting in significant injury to the family, and continuing bullying Anton via unwanted text messages, qualifies as a violation under DASA and the school's own bullying policies. (Dmitry Affidavit, Exh. V: Student Harassment and Bullying Prevention, Board Policy 5312 ["EXH. V"])

20. The school failed to follow its own procedures in terms not only of its due process procedures, but also in terms of restorative justice. (Dmitry Affidavit, Exh. N:

Student Policies Goals, Board Policy 5000 ["EXH. N"], EXH. M)  Given that the goal of the school is "to enhance the self-image of each student by helping him/her feel respected and worthy through a learning environment that provides positive encouragement through frequent success" the school has not done its job in promoting such unless one deems it a "success" to suspend a student for having a brief, calm conversation with another person with no ill intent about an important event. (Dmitry Affidavit, EXH. N) It certainly does not enhance their self-image.  In addition, given the Commissioner of Education's encouragement of restorative justice, when appropriate, and given that Anton was already out of school for nearly a month based upon an unfair and unconstitutional suspension, the suspension should have been, at minimum, expunged and overturned.

21. The family has a right to an informal conference with the ability to cross examine the complaining eyewitness, J.M., and present their side of the story with the *principal, not the assistant principal or dean.*   This is per Section 3214, the 14th Amendment, and the Supreme Court's ruling in *Goss v Lopez. Id.*   The informal conference must take place prior to any suspension unless there is reason to believe there is a safety issue, but in any case, it must take place. Section 3214, *Id.* In fact, no informal conference with *any* school personnel ever took place.

22. There is a right to confront complaining first hand witnesses at the informal conference and the superintendent's hearing.  Section 3214, *Goss, supra.*  Given a second bite at the apple on the 15th, the school district dropped the ball again and tried to evade the weakness in their case:  that J.M. was not at the informal

conference or at the hearing. By not producing the dean as their second-hand witness the first day, and trying to delay the hearing start so that the family would be forced to come back a second day, the school district acted in bad faith, clearly hoping that the family would give up. Being that J.M. is the only witness to what happened, it does not matter if anyone else complained besides him—even if they are an adult. In fact, there is not and never was a sufficient case against Anton or an eyewitness would have been produced.

23. No proper investigation was done, or the short-term suspension and decision letters would not have been handed to Dmitry on the same day, at the same time, and without holding an informal conference. The District's investigation was sloppy at best. They asked the NCPD to do their job and carry out their own investigation after a prior threat at the high school two weeks before put the entire community on edge. That said, once discovered, the District tried to cover up what they had done.

24. Additionally, the catch-all charge in 3214(3)(a) DOES concern threats. When Anton was found not guilty of saying, "There's going to be a school shooting tomorrow. I've got that strap on me.", he was paradoxically found guilty of threatening the safety, health and welfare of others. Yet the superintendent never defined how the admitted statement, "There's going to be a school shooting," violated this provision of 3214 and/or the school's own rules regarding threats or other violations. It was never alleged that he said this in a provocative manner, for instance, or for an improper purpose. The burden is on the District to make its case and they failed to do so.

25. No factfinding was done whatsoever, nor were credibility determinations as to witnesses made, which is illegal under commissioner's decisions. See *Appeal of P.D.*, 46 Ed Dept Rep 15,438 (8/7/06). No legal basis for finding Anton guilty was outlined in the decision, which was barely two pages long. (Dmitry Affidavit, EXH. I)

26. The family's Fourth Amendment right to privacy was violated, which includes the right to be secure in one's home and possessions. Not only did the police, through their EMT, interview Anton about his medication and mental health without his parents present, (something Loor freely admitted the DHS coordinates), Dmitry was forced to consent to a search of his home while he was away with his son at a hospital to which he was forcibly taken due to the school's own misconduct. His son's personal rights to privacy in the form of bodily autonomy were violated while he suffered a search of his person. (Loor denies a patdown took place.) (Dmitry Affidavit, EXH. A, P. 6) Indeed, the hospital personnel found nothing wrong whatsoever with Anton as the school knew they would. (Dmitry Affidavit, Exh. F, Letter from NUMC, dated April 19, 2023 ["EXH. F"])

27. The family has suffered financial losses due to the illegal and unfair suspension. Due to the fact the family is financially unable to move out of the district at this time, Dmitry has requested a transfer to another school within the district under Board Policy 5110 based upon the bullying by J.M. and others. (Dmitry Affidavit, Exh. W: Request for Intradistrict Transfer dated August 8, 2023 ["EXH. W"])

28. Loor stated that he believed J.M. because he had good grades. When asked if J.M. was honest, he stated that J.M. was; and when asked if Anton was, he said, "at

times". (Dmitry Affidavit, EXH. A, pp. 7-8) This is not borne out by the record and shows bias against Anton

29. Loor, Lynch and Breslin knew that the kids were discussing the community-wide which happened on March 28, 2023 and knew that this is something they were entitled to do, whether Breslin forbade it or not. The District had no right to suspend Anton for exercising his First Amendment rights, based upon a perfectly normal concern under the circumstances, especially given that apparently kids are showing each other videos of stabbings at other schools. Dmitry Affidavit, Exh. H: Email to Parents dated March 28, 2023 ["EXH. H"]; EXH. A, P. 19) In addition, sending out a notice to area parents stating that they had taken some kind of action in response to a "copycat threat", knowing that it was not true, is malicious. (Dmitry Affidavit, Exh. J; Email to Parents dated April 19, 2023 ["EXH. J"])

30. The District's behavior is arbitrary and capricious in that it does not follow Section 3214 or the school's own rules, is an error of law in that it is unconstitutional under the First, Fourth and Fourteenth Amendments to the US constitution, and lacks a rational basis. There was not enough competent and substantial evidence of any sort of threat, whether with a weapon or verbally, to the health, safety, or welfare of the members of the school community. The suspension should be overturned, the record expunged and the DASA complaint listed as founded as against the District as well as against J.M. The Commissioner should order that the District grant the intradistrict transfer request be granted.

## REQUESTS FOR RELIEF

WHEREFORE, it is respectfully requested that the commissioner enter an order:

Granting Petitioners' application for a stay order by ordering the suspension overturned and expunged and the DASA complaint founded;

Granting Petitioners' request to be transferred to the other middle school in District;

And for such other and further relief as the Commissioner deems just and appropriate.

Dated:  August 14, 2023

/s/Suzanne Myron
Suzanne Myron, Esq.
Attorney for Petitioners
Anton and Dmitry Pshenichnykh
The Law Office of Suzanne Myron
6800 Jericho Turnpike  Suite 120W
Syosset, NY 11791
(516) 393-5821

TO:
Kenneth Card
Superintendent
o/b/o
East Meadow Union Free School District
718 The Plain Road
Westbury, NY  11590

Office of Counsel
New York State Education Department

State Education Building
89 Washington Avenue
Albany, NY 12234

STATE OF NEW YORK
STATE EDUCATION DEPARTMENT
------------------------------------------------------------X
In the Matter of the Application of Anton,
an infant under the age of fourteen years, by his father
and natural guardian, DMITRY PSHENICHNYKH,
and Anton, individually,

Petitioners

from the action of
THE BOARD OF EDUCATION OF
THE EAST MEADOW UNION FREE SCHOOL DISTRICT,

Respondents

regarding the Short and Long-Term Suspensions Imposed          **VERIFICATION**
on Anton Under Section 3214 of the Education Law
Respondents
------------------------------------------------------------X
STATE OF NEW YORK        }
COUNTY OF NASSAU         } ss.;

Dmitry Pshenichnykh, being duly sworn deposes and states that she is the petitioner in this
proceeding; that she has read the annexed petition, affidavits and exhibits and knows and
understands the contents thereof; that the same is true to the knowledge of the deponent
except as to the matters therein stated to be alleged upon information and belief, and as to
those matters he believes them to be true.

                                                    Dmitry Pshenichnykh
                                                    192 Cornell Street
                                                    Hempstead, New York 11550
                                                    347-425-2697

subscribed and sworn to before me this
22 day of August 2023


Suzanne Myron
Notary Public, State of New York
No. 02MY6251566
Qualified Nassau County
Commisson Expires December 12, 2024

15

STATE OF NEW YORK
STATE EDUCATION DEPARTMENT
------------------------------------------------------------X
In the Matter of the Application of Anton,
an infant under the age of fourteen years, by his father
and natural guardian, DMITRY PSHENICHNYKH,
and Anton, individually,

Petitioners

from the action of
THE BOARD OF EDUCATION OF
THE EAST MEADOW UNION FREE SCHOOL DISTRICT,

Respondents                                                         **LIST OF**
                                                                    **EXHIBITS**

regarding the Short and Long-Term Suspensions Imposed
on Anton Under Section 3214 of the Education Law

------------------------------------------------------------X


Exhibit A:      "Transcript of Superintendent's Hearing Held on May 15, 2023"

Exhibit B:      "Text Message", dated April 19, 2023

Exhibit C:      "Email Exchange with Loor", dated May 19 to 22, 2023

Exhibit D:      "Short Term Suspension Notice Letter", dated April 19, 2023

Exhibit E:      "Short Term Suspension Decision Letter" dated April 19, 2023

Exhibit F:      "Letter from NUMC" dated April 19, 2023

Exhibit G:      "Superintendent's Hearing Notice Letter" dated April 20, 2023

Exhibit H:      "Email to Parents" dated March 28, 2023

Exhibit I:      "Superintendent's Hearing Decision Letter" dated May 16, 2023

Exhibit J:      "Email to Parents" dated April 19, 2023

Exhibit K:      "Transcript of Superintendent's Hearing Held on May 9, 2023"

Exhibit L:      "DASA Complaint" dated June 6, 2023

Exhibit M:      "Code of Conduct for Elementary and Secondary Schools", Board Policy

                5305

Exhibit N:      "Student Policies Goals", Board Policy 5000

Exhibit O:      "Letter from City Motor Auto Sales" dated July 14, 2023

Exhibit P:      "Commissioner Appeals Which Involve Real Threats – Summary"

Exhibit Q:      "Commissioner Appeals Which Involve Real Threats – Detailed"

Exhibit R:      "Bench Brief on Relevant Commissioner's Decisions"

Exhibit S:      "Student Suspension", Board Policy 5313.3

Exhibit T:       "Board Appeal" dated June 29, 2023

Exhibit U:      "Appeal Denial" dated August 4, 2023

Exhibit V:      "Student Harassment and Bullying Prevention", Board Policy 5312

Exhibit W:      "Request for Intradistrict Transfer" dated August 8, 2023

Exhibit X:      "Board Policy 8635-E"

Exhibit Y:      "Searches and Interrogations", Board Policy 5330

STATE OF NEW YORK
STATE EDUCATION DEPARTMENT
----------------------------------------------------------------X
In the Matter of the Application of Anton Pshenichnykh,
an infant under the age of fourteen years, by his father
and natural guardian, DMITRY PSHENICHNYKH,
and Anton, individually,

Petitioners

from the action of
THE BOARD OF EDUCATION OF
THE EAST MEADOW UNION FREE SCHOOL DISTRICT,
                                                                    **AFFIDAVIT OF**
Respondents                                                         **DMITRY**
                                                                    **PSHENICHNYKH**

regarding the Short and Long-Term Suspensions Imposed
on Anton Under Section 3214 of the Education Law
----------------------------------------------------------------X
STATE OF NEW YORK        }
COUNTY OF NASSAU         } ss.;

I, Dmitry Pshenichnykh, being duly sworn deposes and states the following under

penalty of perjury:

1.      I am the father of Anton.  Anton is twelve years old. Anton and I live together

at 192 Cornell Street, Hempstead, New York 11550.

2.      Anton and I have lived in the East Meadow Union Free School District since he

was eight years old.  Anton is now in seventh grade.  He attends W.T. Clarke Middle

School.

3.      I am a single father and have to work as many hours as I can, being the main

source of support for him.  His mother has visitation rights but is not involved in his

life on a regular basis.

1

3.      I am a single father and have to work as many hours as I can, being the main source of support for him. His mother has visitation rights but is not involved in his life on a regular basis.

4.      Since Anton was young I have been self employed in order to have the flexibility to care for him. Since 2017, I made a living as a rideshare driver for companies such as Uber and Lyft. This enabled me to make enough money to pay rent, utilities and put food on the table. However, after the pandemic hit, it was very hard to find enough work to keep doing this. I also became ill from COVID-19 and had to switch to contactless delivery. Finally, we lost our apartment in-district and had to move into temporary housing in Hempstead.

5.      The app that I now work for has an algorithm that prioritizes drivers who work frequently. I could not drive for Uber and Lyft, which is more lucrative, because Anton was with me all day in the spring after they suspended him on April 20, 2023. For instance, I had to stay home during the time Anton was home because the shelter will not allow a 12 year old boy to stay in by himself. I have become very behind on paying bills and this has caused me to lose further assistance from the county because I cannot prove I am working. The school's actions caused me to lose time to look for a new apartment, a more stable job, and delayed submission of my naturalization documents.

6.      Due to these occurrences, I am currently behind on paying for my car which puts me at risk of defaulting on my car loan. (Please see Exh. O – Letter from City Motor Auto Sales dated July 14, 2023 ["EXH. O"]. If I lose the car, I cannot drive for

Uber, Lyft or Doordash. If I cannot do that, I will be unable to provide for my son at all.

7.      My long term goals were to complete the naturalization process and use my recently acquired license in the security field to get a more stable job. I had my interview with the State Department on April 5.

8.      On April 19, 2023, I got a call from Dean Gustavo Loor. The dean said that Anton was accused of making a statement about a school shooting and that my son was in his office.

9.      I went to the school but found when I got there that there were several policemen blocking my way. Soon after, "men in black" arrived. They asked me questions about whether I had weapons at home. I spoke to them for 15-20 minutes while Anton was still inside. (Please see Exh. A, Transcript of superintendent's hearing dated May 15, pp. 31-32 ["EXH. A"])

10.     After the questioning by police, I was asked to come to the vice principal's office. (EXH. A, *Id.*) I saw my son for a few seconds when he was coming out of the dean's office, and didn't have chance to talk to him. The assistant principal, Linda Lynch ("Lynch"), handed me two letters (the short term suspension notice letter and short term suspension decision letter), and followed that with some comment to the effect that it was going to be the anniversary of Columbine and Adolf Hitler's birthday tomorrow (something that I was not aware of, but for the fact the vice principal told me) (EXH A, p. 32, Exhibit D: Short Term Suspension Notice Letter dated April 19, 2023 ["EXH. D"]; Exhibit E: Short Term Suspension Decision Letter dated April 19, 2023 ["EXH. E"]

11.     I was never informed, nor did Anton and I receive at any point, an informal conference with any administrator, which I was entitled to under *Goss v. Lopez*, before the

principal suspended my son. (EXH. A, P. 33) This suspension would last almost a month pending a hearing with the school superintendent which would be held in order to decide whether my son would be given a longer term suspension because I had to find someone to help me with these serious allegations against my son. During this time I never received any informal conference either.

12.     The administration knew that I had to go right away to be able to follow the ambulance, which the police told me would be taking my son to the hospital, and that I would have no time to do so, anyway. (EXH. A, P. 32)

13.     Both letters regarding the five-day suspension made it sound like whatever Anton was accused of was a foregone conclusion. (EXH. D AND EXH. E) Both of the letters accused my son of having a weapon. (EXH. D, EXH. E and EXH. A, P. 32).

14.     I was very surprised to see this. I thought that the United States was a country where one of its dearest values was that people were innocent until proven guilty.

15.     The hospital said my son was not a danger to himself or others. (Please see Exhibit F, Letter from NUMC dated April 19, 2023 ["EXH. F"] ) Hours later, well after the school day was over, my son was released. (EXH. A, P. 35)

16.     At some point, a Nassau County police detective appeared at the hospital and asked if he could search my home while we were gone. (EXH. A, pp. 34-35) I felt pressured when he said he could get a warrant if I didn't comply. I also thought it was unnecessary but consented to the search. We do not have any weapons and they found nothing. (EXH. A, P. 7, P. 35) I told the school this on April 24 when I

requested an adjournment. We left the hospital at approximately 6 p.m. and by the time we got home it was 8 p.m. (EXH. A, P. 35)

17.     The third letter we received, the notice letter for the superintendent's hearing, erased the allegations about my son possessing a weapon. By then it was already too late--our due process rights, privacy rights and our rights to be free from search and seizure had already been violated. (Please see Exh. G, Superintendent's Hearing Notice Letter dated April 20, 2023 ["EXHIBIT G"])

18.     The original superintendent's hearing was scheduled for April 25, 2023, but, based upon the actions of the school thus far, I did not want to attend it without an attorney. Anton was not allowed to attend middle school in the meantime so I had to stay home with him while I tried to find one. To find someone who would do it immediately, and for free, took weeks. This caused great financial strain on my family. Finally I found Suzanne Myron. We attended the first part of the superintendent's hearing on May 9, 2023 starting at 1:30 p.m. (Please See Exh. K, Transcript of Hearing dated May 9, 2023, pp. 11-12 ["EXH. K"]

19.     Anton, Anton's mother, Ms. Myron and I sat in the hearing room for an hour waiting for the hearing officer and the school attorney. I was very nervous and this made everything worse. District personnel, including the superintendent, who was the hearing officer that day, and their attorney finally emerged at 2:30 p.m. No reason was given for the delay. (EXH. A, pp. 2-3)

20.     In its case-in-chief, the District put on the principal, Stacy Breslin ("Breslin"), and Lynch, neither of whom had even spoken to the sole "eye" witness. This witness, a student named J.M., was not present. (EXH. K) As the dean indicates in the hearing

transcript, J.M. was the only one besides Anton with first hand knowledge of what happened. (EXH. A, pp. 3-4) He was also the reporting witness. (EXH. A, *Id.*) However, the principal and vice principal and, initially, the dean, lied about this on the May 9, 2023 hearing date, and said two other student witnesses had seen what happened. This was untrue. (EXH. K, pp. 11-12, p. 20)

21.     The District rested its case on May 9 without putting on the one adult "witness", Dean Loor, who had spoken to J.M. face to face. (EXH. K, EXH. A, pp 3-4) The principal, who had come to the dean's office last on April 19, and vice principal, who had come to the dean's office second to last, made it clear that the dean was the only one who had spoken to J.M. (EXH. K, P. 7, P. 19)

22.     By this time it was 4 p.m. on May 9. When my attorney, Suzanne Myron, asked to call the Dean she was told he had "gone home for the day" even though she had asked twice that day, both early and later, to speak to him. (EXH. K, p. 7, pp.20-21). We were forced to continue the hearing to another date the following week. (EXH. K, pp. 20-23), which cost me time from work once again.

23.     At the second hearing date, on May 15, 2023, both I and Anton spoke on the record. (EXH. A) The dean was finally produced and was also interviewed. (EXH. A) The dean testified that J.M. was on his way to a detention when he decided to report my son's behavior as a "threat". (EXH. A, P. 3) Breslin and Lynch seemed confused about what had happen, and Breslin even had to look at her notes at one point.

24.     On May 15, the penalty phase of the hearing took place. The school introduced Anton's school records. His grades were not great. In fact, we found out

he was failing most of his classes after the hearing was over. It is something I know we need to work on in the future and we will do it, with the school's help.

25.    Anton was nervous about the incident at school that had been reported a few weeks prior. (EXH. A, p. 21) I know a letter to parents went out about it. (Please see Exhibit H, Email to Parents dated March 28, 2023 ["EXH. H"]) Apparently it was a threat made at the high school which the middle school kids must have been talking about a lot. (EXH. K, P. 15, P. 20, EXH. A, P. 1, P. 12, P. 17, P. 28 and pp. 37-38) The school also apparently sent an email about the alleged threat that AP made as well. (Please see Exh. J: Email to Parents dated April 19, 2023 [EXH. J])

26.    We later received a letter from the superintendent which tersely stated that Anton was guilty of "endangering the safety, physical, mental health or welfare of others". (Please see Exh. I: Superintendent's Hearing Decision Letter dated May 16, 2023 ["EXH. I"] It gave no explanation as to why this was so. The letter was devoid of any factfinding. It was also devoid of any attempt to weigh the credibility of the witnesses, even though my son and I had testified and our testimony did not agree with that of the administrators and no first hand witnesses had showed up. It did not try to outline the law, or apply it to the facts, even though my attorney submitted several bench briefs. (Please see Exh. O: Commissioner Appeals Which Involve Real Threats – Summary ["EXH. O"]; Exh. P: Commissioner Appeals Which Involve Real Threats – Detailed ["EXH. P"]; Exh. Q: Bench Brief on Relevant Commissioner's Decisions ["EXH. Q"] It did not give us a timeframe for appeal. Finally, it never addressed the short-term suspension my son received, even though we had raised the issue at the hearing and there is nothing in the Code of Conduct or in the separate

document called "Student Suspension" that says we cannot do so. (EXH. I; Please see Exh. M: Code of Conduct for Elementary and Secondary Schools Board Policy 5305 ["EXH. M"], Please see EXHIBIT R: Student Suspension, Board Policy 5313.3 ["EXH. R"])

27.    Shortly after that, we received a copy of the recording via email from the District's counsel, Michael Raniere, and I was able to have it transcribed by my girlfriend. (EXH. K, EXH. A) (**Recording sent via email attachment to office of counsel**).

28.    Immediately after the hearing was over, the school guidance counselor called the manager of the shelter I am staying in and spoke to her about Anton  She is not related to us nor is she listed as an emergency contact.  I have since told the guidance counselor not to do this.  I do not understand why they are not following their own rules, which state that they may not contact anyone outside of those on the emergency contact list, which I filled out when Anton went to the middle school.

29.    Right after the hearing was over, the child that reported my son, J.M., began harassing my son repeatedly via text messages, several of which seemed like a veiled threat. (Exh. B:  Text Message dated April 19, 2023 ["EXH. B"]) I reported this to Loor (Exh. C:  Email Exchange dated May 19 to May 22, 2023 ("EXH. C"]) and submitted a DASA complaint on June 2 to Lynch.  (Exh. L, DASA Report dated June 6, 2023 ["EXH. L"]) I never received a reply to the DASA complaint from Lynch or anyone else.

30.    My son has also received threats indirectly from other kids. We received an email back from Loor, but he seemed only to make excuses for the other child's behavior, saying J.M. was just worried about my son. The problem with that is Anton

never gave J.M. his phone number and if J.M. was worried he could have left a brief message through a mutual friend instead of repeating Anton's name a hundred times via an unsolicited text message. Although Anton wanted to befriend J.M. at the time he made the statement to him, they are not and were never friends. I also do not understand why he would make a comment about Anton "faking his death for clout and attention". [EXH. C] This is a very odd statement and I'm not sure why someone would think Anton was pretending to be dead.

31. This entire situation has caused damage to my finances as well as emotional distress. Anton has also suffered emotional distress and damage to his reputation because the school notified not only the NCPD but the Department of Homeland Security. They also sent out a letter to District parents, and most of the kids knew who it was about because they saw the ambulance leave with Anton in it and the many policemen on the scene. (EXH. J, EXH. A, P. 13, EXH. K, P. 22]) I am concerned that, should I not be able to put food on the table and keep the lights on at my residence, my son might be at risk of being taken from me.

32. We filed an appeal with the board of education on June 29, 2023. (Exh. S: Board Appeal dated June 29, 2023 ["EXH. S"] We received a response in early August stating that the suspension was upheld and expungement was denied.. (Exh T: Appeal Denial Letter dated August 4, 2023 ["EXH. T"]) With the delays caused by the District, I have lost so much time from work that we had to delay our move date to later as I have been unable to save up enough money to do so. I did ask for a transfer of schools from the District last week due to the filing of my DASA complaint but have

yet to hear whether they have approved this request and do not have time to wait.

(Exh. W: Transfer Request dated August 2023)

33.     I do not understand why a child cannot speak about something at school which adults seem to have no problem speaking about amongst themselves. People of all ages still speak about the Columbine and Parkland school shootings today. The vice principal mentioned Columbine herself when giving me the short term suspension letters. My son was warning another child about a matter of mutual concern to the students in the community. The assemblies the school has are a warning to the kids as well. It seems as though my son is simply imitating the staff and the older children at the high school, some of whom were concerned enough to stay home apparently after they heard this rumor. I had heard that even some of the middle school kids stayed home, probably because they have older siblings who knew about this. The school even sent out a letter to the parents. [EXH. H]

34.     I don't understand why the school chose to violate my son's due process rights and ignore *Goss*. I don't understand why they chose to believe a child, J.M., who was on his way to a detention that day, according to the dean's statement at the hearing, instead of my son, who was not. [EXH. A, P. 3] Anton received a five day suspension based upon a lie that the principal knew was not true when she issued the notice and decision letters. This inadequate investigation and suspension then led to a superintendent's hearing and a longer-term suspension which is unwarranted, and shows the school acted in bad faith. It is true that my son has not been a great student and has failed most of his courses, but this has not been addressed by the school either. They have ignored subsequent bullying by J.M.,

which further shows a prejudice against my son as a student who is not such a "good student" as per Loor and a bias toward J.M., who allegedly is. (EXH. A, P. 7)

35.    I don't understand why my son is not allowed to talk about matters which are very concerning to us all with someone else at school. According to former Supreme Court Justice Hugo Black, "the very reason for the First Amendment is to make the people of this country free to think, speak, write and worship as they wish, not as the government commands."

36.    I don't understand why there are kids showing videos of stabbings in the bathroom at the middle school. (EXH. A, P. 29)  My son spoke about the child who showed him the stabbings at the hearing and as far as I know nothing was done about that either as we never heard anything further.  (EXH. A, *Id.)* No formal DASA complaint was filed but I think speaking about it on the record at a hearing should be enough for the District to report it to the DASA coordinator to my understanding of the law.

37.    I also do not understand why I had to tell J.M. to stop contacting my son while the school stands by and does nothing about his behavior, which seems to me like a veiled threat. I don't understand why the principal lied about the other kids being witnesses when they were not.  This is very frightening and feels intentional.  If the school does not follow the rules, the kids are not going to do that either.

38.    Further, I don't understand why the school is calling the shelter manager where we live and telling her things about my son.  She is not a contact for my son. We are private people and the shelter manager is not on my son's contact list, I never gave them permission to do that. This seems like a violation of their rules as well, and

11

my right to privacy under the constitution.  The fact the school has done all of these things feels like a malicious act. They seem to want to violate our constitutional rights.

39.     If I do not get this resolved soon, Anton will have to start school in the fall with an incorrect record which makes him out to be something he isn't.  Anton is a good kid, and while he is not a great student at this point in his life, our situation is an unfortunate, but temporary one.  The fact I cannot get out of temporary housing this year due to the school's actions in putting me behind on earning income and paying bills is a major reason we cannot make further strides in this area. Due to the bullying which took place, both from the school and the other kids, Anton does not want to go back to W.T. Clarke Middle School and **we have asked for a transfer as per school policy.  That said, a transfer might not do much good if the new school thinks he is a bad kid.  This is why I need an immediate stay and expungement of the record prior to the start of school.**

**Documents**

40.     I have reviewed the documents which are attached to this appeal. They are:

Exh. A: Transcript of Anton's Superintendent's Hearing held on May 15, 2023; Exh. B: Text Message dated April 19, 2023; Exh. C:  Email Exchange with Loor dated May 19 to May 22, 2023; Exh. D: Short Term Suspension Notice Letter dated April 19, 2023; Exh. E: Short Term Suspension Decision Letter dated April 19, 2023;  Exh. F: Letter from NUMC dated April 19, 2023; Exh. G:  Superintendent's Hearing Notice Letter dated April 20, 2023; Exh. H: Email to Parents dated March 28, 2023; Exh. I: Superintendent's Hearing Decision Letter, dated May 16, 2023; Exh. J: Email to

May 9, 2023, Exh. L: DASA Complaint dated June 6, 2023; Exhibit M: Code of Conduct for Elementary and Secondary Schools, Board Policy 5305; Exh. N:  Student Policies Goals, Board Policy 5000; Exh. O:  Letter from City Motor Auto Sales dated July 14, 2023; Exh. P:  Commissioner Appeals Which Involve Real Threats – Summary; Exh. Q: Commissioner Appeals Which Involve Real Threats – Detailed; Exh. R:  Bench Brief on Relevant Commissioner's Decisions; Exh. S: Student Suspension, Board Policy 5313.3; Exh. T:  Board Appeal dated June 29, 2023;  Exh. U: Appeal Denial dated August 4, 2023; Exh. V: Student Harassment and Bullying Prevention, Board Policy 5312; Exhibit W:  Transfer Request dated August 8, 2023.; Exhibit X:  Board Policy 8635-E; Exhibit Y:  Searches and Interrogations, Board Policy 5330

41.    I recall all of these documents.  At some point in the recent past I have read and reviewed these documents. I understand what these documents mean. The documents which are attached to this appeal look like copies of the original documents.

Dated: Syosset, New York

August 18, 2023
22nd

**DMITRY PSHENICHNYKH**

subscribed and sworn to before me this

22nd August, 2023

Suzanne Myron
Notary Public, State of New York
No. 02MY6251566
Qualified Nassau County
Commisson Expires December 12, 2024
January

13

STATE OF NEW YORK
STATE EDUCATION DEPARTMENT
----------------------------------------------------------------X
In the Matter of the Application of Anton Pshenichnykh,
an infant under the age of fourteen years, by his father
and natural guardian, DMITRY PSHENICHNYKH,
and Anton, individually,

Petitioners

from the action of
THE BOARD OF EDUCATION OF
THE EAST MEADOW UNION FREE SCHOOL DISTRICT,

Respondents

regarding the Short and Long-Term Suspensions Imposed
on Anton Under Section 3214 of the Education Law
----------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S REQUEST FOR STAY AND INTRADISTRICT TRANSFER**

Suzanne Myron
The Law Office of Suzanne
Myron
6800 Jericho Turnpike Suite
120W
Syosset, NY 11791
Telephone: 516-393-5821
Facsimile: 516-496-9052
Attorney for Petitioners
Anton and Dmitry Pshenichnykh

TABLE OF CONTENTS

Page

SUMMARY ................................................................. 1

FACTS ................................................................... 4

ARGUMENTS ............................................................. 4

**The Family Has Commenced the Appeal Timely Through the
Appropriate Process** .................................................. 4

**The School Has Violated Anton's Procedural Due Process Rights......** 6

    *Goss, State and Local Law and Exceptions*........................... 6
        *The Short-Term Suspension* ................................... 8
        *The Long-Term Suspension* ................................... 13
        *Board Policy Was Not Followed Regarding Searches*........ 16

**The District Denied Anton His Fourth Amendment Rights to Be
Free from Search and Seizure and to Security in One's Home
and Violated State Law and Board Policy**................................... 17

    ***Right to Privacy***............................................... 18

**The District Violated Anton's First Amendment Rights**.................... 19

    ***Right of Free Speech***........................................... 19

CONCLUSION ............................................................. 21

**TABLE OF CITATIONS**                                          Page

*United States Constitution*

14th Amendment                                                 1, 6, 14, 16

Fourth Amendment                                               2, 17, 18

First Amendment                                                3, 16, 19

*Statutes*

Section 3214 of the Education Law                              1, 2, 7-8, 14, 16, 21

Section 3214(3)(b)(1)                                          8

Dignity for All Students Act                                   2-4 17, 22

CPL 140.2                                                      12

Section 3214(c)(1)                                            14

Health Insurance Portability and Accountability Act (HIPAA)    17-19

Family Educational Rights and Privacy Act (FERPA)             18

*Board Policies*

Board Policy 5313.3                                           1, 4, 8-9, 14

Board Policy 5313.3.4                                         4

Board Policy 5305                                             9-10

Board Policy 5330                                             16-17

Board Policy 8635-E                                           16

*Caselaw*

*Goss v. Lopez*, 419 U.S. 565 (1975)                         1, 6-8, 14, 16

*Appeal of F.M.*, 48 Ed Dept Rep 15,849                      5, 8

*Appeal of D.B.*, 57 Ed Dept Rep 17,244                      5

*Appeal of John Doe and Jane Doe,* 61 Ed Dept Rep 18,088          5

 *Appeal of L.O.,* 62 Ed Dept Rep 18,267                         7, 13

*Appeal of Quinton Pierso*n, 34 Ed Dept Rep 13,399               8

*Appeal of S.C.,* 34 Ed Dept Rep 15,134                          8

*Appeal of Student with a Disability,* 57 Ed Dept Rep 17,258     8

*Appeal of Student with a Disability,* 58 Ed Dept Rep 17,503     9

*Appeal of P.B.,* Ed Dept Rep 16,553                             13

*Appeal of T.R.* Ed Dept Rep 15,335                              13

*Appeal of P.D.,* 46 Ed Dept Rep 15,438                          14

*Appeal of Student Suspected of Having a Disability,*
        40 Ed Dept Rep 14,464                                    14

*Appeal of Johnson,* 34 Ed Dept Rep 13,234                       16

*Appeal of M.A.,* 47 Ed Dept Rep 15,663                          16

*NJ v. TLO,* 469 US 325 (1985)                                   16, 17

*People v. Marquan M.,* 994 N.Y.S.2d 554 (N.Y. 2014)             17

*Appeal of Student with a Disability,* 50 Ed Dept Rep 15,168     17

*Katz v. US,* 389 U.S. 347 (1967)                                18

*Rakas v. Illinois,* 439 U.S. 128 (1978)                         18

*Tinker v. Des Moines Independent School District,* 393 U.S. 503 (1969)   19

*Watts v. US,* 394 U.S. 705 (1969)                               19

*Virginia v. Black,* 538 U.S. 343 (2003)                         20

*Elonis v. US,* 575 U.S. 723 (2015)                              20

*Starbuck v. James City County School Board,* 28 F.4th 529 (4th Cir. 2022)   21

*J.C. v. Beverly Hills Unified School District,* 711 F.Supp.2d 1094    21
    (CD CA 2010)

**Other Authorities**

8 NYCRR 100.2    7

8 NYCRR 100.2(l)(4)    7

*Policing Students,* Harvard Law Review 128 Harv. L. Rev. 1747 (2015)  18

David Hudson, *Student Expression in the Age of Columbine,*
    First Amendment Center, Vol. 6 No. 2, Sept. 2005    19

Joseph Blocher and Bardia Vaseghi, *True Threats, Self-Defense and the*
    *Second Amendment,*  The Journal of Law, Medicine & Ethics,    21
    48 S2 (2020)

**TO THE COMMISSIONER OF EDUCATION:**

This memorandum of law is provided in support of the Pshenichnykh family's petition which is brought under Article 7 §310 of the Education Law in regards to commissioner appeals and Article 7 §311.2 in regards to the granting of a stay.

### SUMMARY

The East Meadow District has violated Anton's and his family's constitutional rights in regards to procedural due process under the 14th Amendment and *Goss v. Lopez* when District personnel first grilled Anton, then suspended him immediately without an informal conference and a proper investigation. After they called the police, Anton was further grilled by them and their ambulance personnel regarding medical information and forcibly taken from the school in an ambulance in front of his peers at the middle school. They also caused his home to be searched by police. All of these actions by police were known outcomes on the part of the school administration.

The District violated these rights again in carrying out a hearing which was improperly conducted. Section 3214 of the Education Law as well as Board Policy 5313.3 codifies and fleshes out these rights and they too, were violated.

The state and local law violations have to do not not only with a failure to properly investigate, which would have included an informal conference, but also a failure to allow confrontation and cross examination of the first hand witness—not just one time but *twice*—as the witness did not appear at the superintendent's hearing either.

1

Yet, the witness was allowed to harass Anton after the proceedings had concluded, and it was clear J.M. had not told the truth, in violation of the Dignity for All Students Act (DASA).

The District failed to follow through with appropriate factual findings and witness credibility determinations when the superintendent issued his decision on the long-term suspension. Although some justifications were made during the penalty phase in regards to why he was finding Anton guilty only of the "catch-all" provisions in 3214 regarding threats to health, safety and welfare (morals were not listed for some reason), the superintendent never gave any reasoning for this in his written decision. There was no fact finding done and no legal reasoning outlined beyond the short speech he made at the hearing. In addition, despite the fact Anton's story did not jibe with the witness' stories, he failed to make witness credibility determinations, which the commissioner has said is not allowed.

The District has violated Anton's and his family's Fourth Amendment rights to be free from search and seizure of his person and the right to be secure in one's home. This was done by first searching him and his bag at the dean's office, then by both calling police and knowing that police would take Anton to the hospital without parent permission. Ultimately, the administrators knew that this would force his father to consent to a search of their home while they were at the hospital as this was typical police protocol, something the dean admitted to knowing.

The District has violated Anton's Fourth Amendment right to privacy in two ways. Anton was interviewed by police and ambulance personnel regarding his private

2

medical information. The police searched the family's home and "reported back" their findings as to whether the family possessed any weapons, which was none of the school's business.

The District's actions violated Anton's First Amendment right to freedom of expression in the school community as the speech in question was not a "true threat". Rather, it was a very brief conversation in the hallway between two students about a matter of community concern. Commissioner caselaw has taken a "know it when I see it" approach to free speech. However, the commissioner has never found a student guilty under circumstances such as these, and similar caselaw in other states indicates that this situation is not one of those that would constitute a true threat.

The petitioners have applied to the school for an in-district transfer because of the school's actions. Because of the spectacle the administrators created when they called the police without adequate investigation, they do not feel Anton can continue at the middle school. Not only was Anton bullied subsequent to this travesty by J.M., the first hand witness, J.M. failed to show at either an informal conference or at the superintendent's hearing.

Rather than addressing why J.M. wasn't there, the dean made excuses for J.M.'s terrible conduct both during the hearing and subsequently. In spite of being informed of the subsequent bullying by Dmitry on May 19, he withheld information regarding filing a DASA complaint and never mentioned whether he reported it to Lynch. Since Dimitry's filing of the DASA complaint with Lynch on June 6, no response has been received.

Petitioners now ask that the intradistrict transfer be granted so that Anton can

3

attend the other middle school, Woodland.  They also ask that the Commissioner overturn the short- and long-term suspension and expunge the record.  Further, they ask that the DASA be determined founded.

## FACTS

Please refer to the facts outlined in Petitioners' Petition and the Affidavit of Dmitry Pshenichnykh ("Dmitry Affidavit") as well as the transcripts of May 9, 2023 (Dmitry Affidavit, Exh. K: Transcript of Superintendent's Hearing Held on May 9, 2023 ["EXH. K"] and May 15, 2023 (Dmitry Affidavit, Exh. A: Transcript of Superintendent's Hearing held on May 15, 2023 ["EXH. A"]

## ARGUMENTS

**The Family Has Commenced the Appeal Timely Through the Appropriate Process**

The Petitioners appeal both the short- and long-term suspensions.  As per Board Policy 5313.3.4 (Dmitry Affidavit, Exh. S:  Student_Suspension, Board Policy 5313.3 ["EXH. S"]) the only requirement for a short-term suspension appeal is that the "parent may appeal the decision to the Superintendent".  It does not specify how much time there is to appeal, how the appeal must be made, nor what happens to the short-term suspension appeal subsequent.  Usually, parents take an appeal to the board, so that is what petitioners did.

Since Superintendent Kenneth Card ("Card") was present as hearing officer for the entirety of the long-term suspension hearing, petitioners made it clear that they were appealing the short-term suspension as well as the long-term suspension. (EXH. K, P. 9) This was discussed on the record by petitioners' and respondents' counsel, the latter of whom stated that the short term suspension could not be appealed at the hearing. (EXH. K, pp. 9-10) Having given no authority for this statement, petitioners objected. (EXH. K, pp. 9-10) At the end of the hearing, petitioners submitted bench briefs to Card, who said he would "read the documents" petitioners had given him, even though they were never properly numbered as exhibits. (EXH.. A, P. 44) There was no ruling on the record as to whether they could be considered exhibits, therefore, petitioners believe they should have been. (EXH A)

Card issued a decision on the long-term suspension via a letter dated May 16, 2023. (Dmitry Affidavit, Exh. I: Superintendent's Hearing Decision Letter, dated May 16, 2023 ["EXH. I"])  The letter did not address the short-term suspension at all, nor did it list a timeline or procedure to appeal the long-term suspension. (EXH. I) Because recordings were made, petitioners had to get copies of the recordings transcribed. (Dmitry Affidavit, pp. 7-8)   According to the Commissioner's caselaw, and in the interests of fairness since it took time to have the transcriptions made, where no direction is given, the petitioner has extra time to bring the appeal to the board. *Appeal of F.M.*, 48 Ed Dept Rep 15,849. *Appeal of D.B.*, 57 Ed Dept Rep 17,244. *Appeal of John Doe and Jane Doe*, 61 Ed Dept Rep 18,088.

The appeal of both suspensions then went to the board of education. Finally, the

board issued a decision on August 4, 2023 denying the appeal of "the suspension", without indicating to which suspension they referred. (Dmitry Affidavit, Exh. U:  Appeal Denial dated August 4, 2023 ["EXH. U"]) This appeal of both suspensions, thus, is timely brought.

**The School Has Violated Anton's Procedural Due Process Rights**

***Goss, State and Local Law and Exceptions***

The seminal United States Supreme Court case, *Goss v. Lopez,* outlines basic procedural due process rights required of public schools prior to suspension of any student.  *Goss v. Lopez,* 419 U.S. 565 (1975) As per Justice Byron White, writing for the majority, public school in Ohio is an entitlement to which children have a right, i.e. a free and appropriate education ("FAPE").  *Goss,* 419 U.S. 565, 573 (1975). This implicates the 14th Amendment to the United States Constitution, mandating procedural due process rights to notice and a hearing *prior* to any suspension imposed by schools.  *Goss,* 419 US 565, 574, 582 (1975)  Because some punishments are milder than others, the court held, schools should give more process on longer suspensions, and did not rule out more process on unspecified types of shorter suspensions (Although they did not define what this meant, it is assumed it may be for more serious accusations, even if the punishment is mild.).  *Goss,* 419 US 565, 584 (1975)

*Goss* involved the suspension of a group of students who were charged with various disciplinary violations arising out of a protest at school.  The suspensions lasted 10 days and the students had no opportunity to see or contest the charges prior or

6

subsequent to the suspensions. *Goss*, 419 US 565, 569 (1975)

Justice White stated that students facing long-term suspensions, which he defined as being more than 10 days, had to be given adequate written notice of the charges (a "notice letter"), with enough specifics to allow them to prepare a defense. *Goss*, 419 US 565, 579-581, 584 (1975) The students were also entitled to a fair hearing with the opportunity to cross-examine witnesses, to bring an attorney and their own witnesses, and to be able to testify on their own behalf and see the evidence against them prior to its introduction. *Goss*, 419 US 565, 579-581, 584 (1975)

For a suspension 10 days or less, the Court held that due process, including notice and a hearing, including a right to cross examine as well as present the student's own evidence, were still required. *Goss*, 419 US 565, 579-581 (1975) The court wanted the notice and hearing to be prior to any suspension, even a small suspension like in-school, with the only exception listed being for dangerous conduct. This dangerousness exception allowed for immediate removal of those students whose "presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process" *Goss*, 419 US 565, 582 (1975)

Thus, the Commissioner has required that the "dangerousness" exception to the pre-suspension informal conference requirements in Section 3214 and Section 100.2 be spelled out in the "notice letter" whenever it is used. *Appeal of L.O.*, 62 Ed Dept Rep 18,267. This notice should specify why the school chose not to meet with the parent and student prior to the initial suspension and why the student's conduct is so dangerous that the school could not do so. *Id., Goss, Id.*

7

*The Short-Term Suspension*

Taking its cue from *Goss*, Section 3214 of the Education Law, 8 NYCRR 100.2(l) (4) and the school's own Board Policy 5313.3 outline in detail the procedures that New York public schools must take when suspending a student from school. If the suspension is five days or less, the student is entitled to an informal conference with the principal prior to any suspension taking place (with the exception for dangerous behavior, noted above). Section 3214(3)(b)(1). The school is also required to investigate, as *Goss* presupposes. *Goss,* 419 U.S. 565, 580; (EXH. S). The informal conference, presumably, is to be part of the investigation. *Appeal of Quinton Pierson*, 34 Ed Dept Rep 13,399; (EXH. S). At the conference, the student must be allowed to confront the complaining witness, as well as cross examine them and tell their own side of the story. *Goss,* 419 US 565, 579-581, 584 (1975); Section 3214(3)(b)(1); (EXH. S)

The short-term suspension, if imposed, may also be appealed, either in-school or to the Commissioner, unless the school documents include a requirement that they must hear the appeal first. *Appeal of S.C.*, 34 Ed Dept Rep 15,134. This usually, but not always, appears in the school's code of conduct for students, as the Commissioner has held that schools should not be allowed to bury the student's short- or long-term suspension appeal rights in a hard-to-find place. *Appeal of Student with a Disability*, 57 Ed Dept Rep 17,258, *Appeal of F.M.,* 48 Ed Dept Rep 15,489.

Most schools also parrot Section 3214 in their codes of conduct, often with additional or complementary requirements that do not fall afoul of *Goss* or the state law. If the school does not give appeal rights in its decision, however, they may not claim later

8

that the parent did not follow their rules. *Appeal of Student with a Disabil*ity, 58 Ed Dept Rep 17,503;  EXH. S)

The East Meadow District has a confusing and disorganized board policy page, with the Code of Conduct, Board Policy 5305 listing little to no information in regards to student's rights in terms of suspensions.   (Dmitry Affidavit, Exh. M:  Code of Conduct for Elementary and Secondary Schools, Board Policy 5305 ["EXH. M"]) Instead, the policy in regards to suspensions can be found in another section, Student_Suspensions Board Policy 5313.3. (EXH. S)

5313.3 outlines the right to a proper investigation: "2. The Building Principal, upon receipt of a recommendation for suspension, or in processing a case for suspension, shall gather the facts relevant to the matter and shall record them for subsequent presentation, if necessary." (EXH. S)

Similarly to Section 3214, albeit with a bit more information, it goes on to say that, "Within two school days after the recommendation is made to the Building Principal, if a suspension of five (5) days or less is determined to be the appropriate form of disciplinary action, the Building Principal shall give the student oral or written notice of the charges against him/her, and if he/she denies them, an explanation of the basis of the evidence against him/her and an opportunity to present his/her side of the story. Within 24 hours after the student is notified and given his/her informal hearing with the Building Principal, upon request, the pupil and his/her parent(s) shall be given a further opportunity for an informal conference with the Building Principal. At this hearing, the parent shall be permitted to ask questions of complaining witnesses under such

procedures as may be established by the Building Principal. After the conference, the Building Principal shall promptly advise the parent(s) of his/her decision. The parent(s) may appeal the decision to the Superintendent." (EXH. S)

Board Policy 5305 does not give any more information about appeals of short-term suspensions. (EXH. S)

Anton never had appropriate due process prior to the short term suspension. Assistant Principal Linda Lynch ("Lynch") handed Dmitry two letters, constituting the notice and decision letters, as soon as he arrived at the school on April 19 to pick Anton up. These letters reached the foregone conclusion that Anton was guilty of possessing and displaying a weapon, which Principal Stacy Breslin ("Breslin") called an "inference" based on J.M.'s "tip" to Dean Gustavo Loor ("Loor") regarding Anton's statement. J.M., the apparent complaining witness, claimed that Anton had said, "There's going to be a school shooting tomorrow. I've got that strap on me", (EXH. K, P. 6, P. 8)

The notice and decision letters that Anton received regarding the five-day suspension gave no information about appeals whatsoever.

However, a verbal statement saying "I've got that strap on me" does not necessarily create an inference that a weapon was displayed or possessed when an investigation isn't properly done—particularly when the witness to the statement does not show up to an informal conference with the principal. It can be "inferred" therefore that the reason the school chose not to put the detailed charge of displaying and possessing a weapon from the short-term suspension notice letter in the long-term suspension notice letter is because it could not withstand the hearing process.

10

Apparently, J.M. never claimed he saw the weapon or that Anton said where the "strap" was. No weapons were found in the home, on Anton's person, or in his backpack. Under cross-examination, Lynch admitted no witness had seen a weapon of any sort. (EXH. K P. 21). Casting further doubt on his credibility, J.M. didn't even fill out a written statement, nor was the event or his statement recorded in any way. Yet, even though she was second to interview Anton, Lynch called the police anyway—without waiting for Anton's father to show up. (EXH. K, pp. 20-21)

Although Loor had interviewed J.M., Breslin admitted she had not interviewed J.M. and admitted she had not held an informal conference with the family. (EXH. A, P. 3, EXH. K, P. 7, P. 14) The principal is the only administrator permitted to do informal conferences as per state law.

Loor also interviewed Anton, followed by Lynch, and finally Breslin. (EXH. K, pp. 4-5; P. 18) These unnecessary second and third interviews make it seem like the administrators were trying to get Anton to admit to the statement J.M. alleged he made even though Anton had already denied it once to Loor. During the hearing, Lynch practically put words in Anton's mouth, saying that when she asked him whether he said those things, he said, "It's a joke!" (EXH. K, P. 18) Lynch claimed this was an admission. (EXH. K, pp. 18-19) This can hardly be deemed an admission and certainly isn't competent and substantial evidence, particularly since Anton denied that he ever made the statement.

Further, although Loor states that they always call police first in such "circumstances" (the definition of which he did not elaborate on), the administrators did

11

not do this—at least based upon J.M.'s "tip". They waited until Lynch had interviewed Anton and then Lynch called them when she determined that Anton had "confessed' to making the statement. (EXH. K, P. 6) Apparently, she had no consideration for the fact that a 12 year old is entitled to have his parent there when the police come to the school to interview the child as per CPL 140.2.

      While investigations need to be done, nowhere in the Commissioner or New York court caselaw does it say that administrators should be allowed to harass a student by interviewing him more than once after the student has denied the conduct. Because he was not perceived as truly "honest", they allowed Anton to be treated thus. (EXH. A, pp 7-8. J.M. was not interviewed twice or by two different administrators, nor, apparently, were the other two child "witnesses" interviewed twice. (EXH. K, P. 20) This hardly seems like an investigation that was meant to get to the bottom of things. It certainly is arbitrary and capricious to do so.

      The school staff had already made up their mind regarding Anton-showing bias against him and trying to trick him into admitting to the conduct in question. Because he wasn't a "good kid", they apparently considered this their right to do so. The complaining witness, J.M., was, ironically, on his way to detention. (EXH. A, P. 3) Yet, he was believed without any question by Loor as he knew him to be "honest" and "a good student". (EXH. A, P. 7)

      Indeed, even Anton's two friends allegedly were questioned and, although they were not present at the time the incident took place (or later at the hearing), they, too, were believed. (EXH. A, P. 8) It was only Anton who was never given the chance,

12

alongside his family who support him, to tell his side of the story to the principal and confront J.M. in order to question his version of the story. This goes against not only principles of due process but restorative justice, which would view mediating community concerns and disputes between students to be a good thing. It is also arbitrary and capricious conduct on the part of the school.

Thereafter, even though an entire month went by, Dmitry and Anton never had the chance to confront J.M. in a conference with the principal. **This is an outrageous violation of procedural due process and the short-term suspension must be overturned and expunged.** See *Appeal of P.B.*, Ed Dept Rep 16,553, *Appeal of T.R.* Ed Dept Rep 15,335, *Appeal of L.O.*, Ed Dept Rep 18,267

*The Long-Term Suspension*

The same happened with the subsequent, long-term, suspension—J.M. never showed up to the hearing even though Anton's parents, Anton and their attorney were present and waiting at 1:30 p.m on May 9. (EXH. A, P. 2) In spite of a lot of fancy footwork from the administrator-witnesses, it was clear that Lynch and Breslin could only recite hearsay accounts of J.M.'s statement.  (EXH. K, P. 8, P. 18)  Breslin testified on the record regarding the fact only Loor had heard J.M.'s complaint and interviewed the other two students.  (EXH. K, P. 8)  By delaying the hearing date, they further violated his right to a FAPE and proper process, as the parents never consented to extending the hearing date until they were forced to do so.  (EXH. K, pp. 22-23)

A long-term suspension, defined in Section 3214 as more than five days, requires

greater process than a short-term suspension. Section 3214 Some schools include parts of it in their board policies.  Under the 14th Amendment and *Goss,* students are entitled to a fair hearing, accompanied by counsel if they so choose, as well as a hearing record of some type, with the opportunity to see evidence before it is presented and to bring their own witnesses.  The accused has a right to tell their side of the story. They must also have the opportunity to confront the complaining witness as well --no matter who it is. Likewise, Section 3214 makes it clear that hearsay statements from adults such as administrators or teachers are not substitutes for a first-hand student witness, if the student is the complaining witness.   Section 3214(c)(1)  Board Policy 5313.3 mirrors these requirements. (EXH. S)

In issuing his final written decision, Card sought to avoid expanding on the statements he made on the May 15 hearing date regarding Anton's guilt, further depriving Anton of due process.  (EXH. I) (EXH. A, P. 45)  Card never engaged in fact finding or legal reasoning, nor did he weigh witness credibility in spite of contradictions between Anton's testimony and J.M.'s out-of-hearing statement, as well as the administrator hearsay "witnesses" second-hand accounts of what happened.  (EXH. I, EXH. A, P. 42) The commissioner has stated that witness credibility must be weighed, particularly when there are differing versions of what happened between the accused and the witnesses. *Appeal of P.D.*, 46 Ed Dept Rep 15,438 If it is not, then the Commissioner must make her **OWN** determination as to credibility.  Here, it cannot be determined to be competent and substantial.  *Appeal of Student Suspected of Having a Disability*, 40 Ed Dept Rep 14,464 *Anton was denied the right to cross examine J.M.*

14

Dmitry and Anton were not allowed to see one another the day of J.M.'s accusation. (Dmitry Affidavit, pp. 3-4; EXH. A, P. 31)  Dmitry never saw the principal on April 19, 2023. (Dmitry Affidavit, P. 3 ¶10; P. 4 ¶11; EXH. A. pp 31-34) Dmitry never saw J.M. or the other student "witnesses" either. (Dmitry Affidavit, P. 3 ¶10; EXH. A, pp. 31-34) After being stopped and interrogated by police at the schoolhouse door, Lynch handed Dmitry two letters. (Dmitry Affidavit, P. 3 ¶10, P. 4 ¶13; EXH. A, pp. 32-34) These letters stated his son was a threat to others due to the fact he possessed and displayed a weapon. (Dmitry Affidavit, P. 4, ¶13; EXH. A, pp. 32-34; Dmitry Affidavit, Exh. D:  Short Term Suspension Notice Letter Dated April 19, 2023 ["EXH. D"]); Dmitry Affidavit, Exh. E:  Short Term Suspension Decision Letter Dated April 19, 2023 ["EXH. E"]) From there, he was forced to go straight to the hospital. (Dmitry Affidavit, P. 4, ¶12, EXH. A, pp. 32-34) The school *knew he would not have time to get to an informal conference prior to the suspension that day, as the notice letter indicated he had only until 4 to do so.* (EXH. D) In any case, the decision letter was already given to him before 4 p.m. (EXH. A, P. 34)  As Dmitry testified at the hearing, he did not even leave the hospital until 6 and did not make it home until 8 p.m. (Dmitry Affidavit, P. 5 ¶16, EXH. A, P. 35)  Thus, he and Anton never interviewed J.M.

J.M. did not appear at the hearing either.  (EXH. A, EXH. K) The District's case in chief was thin due to lack of documentary evidence.  J.M. never signed a statement, which speaks volumes about his credibility as well.  Apparently the District confuses presentation of multiple adult hearsay witnesses with one good first-hand witness.

J.M. never contacted Anton prior to the hearing or at any other time he was out on

suspension for a month to find out if he was OK. He only contacted Anton after the hearing to harass him.

The Commissioner has clearly held, in light of *Goss* and the 14th Amendment, that there is a right to cross-examination and confrontation of the first hand witness. See *Appeal of Johnson*, 34 Ed Dept Rep 13,234, where the Commissioner held that administrators are not sufficient witnesses where the original complaining witness is not present at the hearing. See also *Appeal of M.A.*, 47 Ed Dept Rep 15,663 Because of this, both the short- and long-term suspension should be overturned and expunged from Anton's record.

*Board Policy Was Not Followed Regarding Searches*

The District trampled on Anton's right to due process when Anton was detained by the police, put in an ambulance, and had his Fourth Amendment privacy and First Amendment right to free speech rights curtailed. This too, violates the 14th Amendment, *Goss,* and Section 3214, as well as Board Policy.

Board Policy 5330, regarding searches and interrogations, is located apart from the Code of Conduct and Student Suspension policy. (Dmitry Affidavit, Exh. Y: Searches and Interrogations, Board Policy 5330 ["EXH. Y"]) It states that all searches must be founded upon reasonable suspicion. (EXH. Y) As per *NJ v. TLO,* which covers searches in schools, this means that "the action must be justified at inception and reasonably related in scope to circumstances which justified the interference in the first place." *NJ v. TLO*, 469 US 325 (1985) See EXH. X, Dmitry Aff., Board Policy 8635-E.

16

Since there was no proper investigation from the beginning and evidence of a weapon in Anton's possession was lacking, the search of Anton's person and his backpack were illegal and conducted in an arbitrary and capricious fashion. This also violated his Fourth Amendment rights, which will be covered in more detail below.

**The District Denied Anton His Fourth Amendment Rights to Be Free from Search and Seizure and to Security in One's Home and Violated State Law and Board Policy**

As per *NJ v. TLO*, there must be a reasonable suspicion that a crime has been committed in order to search a student's bookbag or person. The District never had evidence of a weapon being carried on the premises or stashed elsewhere—even if you take J.M.'s statement as true, which it was not. Unlike in *People v. Marquan M,* there was no "thud" from the bookbag noticed by a security guard, or any other evidence indicating a weapon might be within. 994 N.Y.S.2d 554 (N.Y. 2014) J.M.'s statement hardly qualifies as reasonable suspicion.

Likewise, the school's own rules, under Board Policy 5330, indicates that the school MUST have reasonable suspicion in order to search a students backpack and person. See also *Appeal of Student with a Disability*, 50 Ed Dept Rep 15,168. This was a violation of Anton's constitutional rights and should be deemed such. The violation of his constitutional rights and failure to follow the procedure outlined in the code of conduct justifies the DASA complaint to be held founded as well as the interdistrict transfer be granted.

*Right to Privacy*

17

Anton's right to privacy was violated when the police and their ambulance personnel were called on him, and he was taken to the hospital without consent from his parents.  The school knew that this would happen when they called the police, as Loor outlined in detail during the hearing, because, as he said, the police (along with Homeland Security) handle the "psych" piece.  (EXH. A, pp. 15-16)  According to Lynch, Anton was asked "at length" about his private medical information, including whether he took any medications and other questions about his mental health.  (EXH. K, P. 19, EXH. A, pp. 24-26) As he said during the hearing, this went on through the ambulance ride. (EXH. A, P. 27) This information is usually protected under HIPAA and FERPA, yet it was shared with police due to the school's actions.

The standard for violations of the Fourth Amendment right to privacy is the possession of a reasonable expectation of privacy.  Under *Katz v. US*, this includes actually having a subjective expectation of privacy that is reasonable. *Katz v. US*,  389 U.S. 347 (1967) One has a justifiable expectation of privacy in one's medical data, as it is protected by HIPAA.  It is incontrovertible that one also has a justifiable expectation of privacy in one's person and in one's belongings. *Rakas v. Illinois,*  439 U.S. 128 (1978) See also *Policing Students*, Harvard Law Review 128 Harv. L. Rev. 1747 (2015) https://harvardlawreview.org/print/vol-128/policing-students/

Dmitry was also asked, while being blocked from the door of the public school trying to get to his son, whether he had any weapons at home.  He was asked, later, to consent to a search of his home, which he felt intimidated into doing.  The Fourth Amendment expressly says we have a justifiable expectation in our homes.

18

The school knew, as per Loor, that this would happen, because, as he said, they usually "report back" about their findings. (EXH. A, P. 7) Being escorted out of the school in an ambulance in front of other students, is a privacy violation, as again it is another HIPAA violation.

**The District Violated Anton's First Amendment Rights**

***Right of Free Speech***

The United States Supreme Court, in *Tinker v. Des Moines Independent School District,* said we do not shed our rights at the schoolhouse door--and free speech is one of them. *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969) The only way to censor such speech is when, using a reasonable person standard, "such expression will create a material interference or substantial disruption of the educational environment or invade the rights of others. The high court reasoned that school officials could not silence student expression simply because of "undifferentiated fear or apprehension." - David Hudson, *Student Expression in the Age of Columbine*, First Amendment Center, Vol. 6 No. 2, Sept. 2005

https://repository.belmont.edu/cgi/viewcontent.cgi?article=1135&context=lawfaculty

The Supreme Court later found an exception for "true threats". However, true threats have not been clearly defined by the Supreme Court. That said, there was some guidance issued in the case *Watts v. US* in the form of a three-part test: (1) whether the statement was made in a political context, (2) whether the statement was "expressly conditional," and (3) the reaction of the listeners. *Watts v. US*, 394 U.S. 705 (1969)

Then, in *Virginia v. Black*, the court stated that context matters when considering the speech in question. *Virginia v. Black*, 538 U.S. 343 (2003)  *Virginia v. Black* involved burning crosses. *Id.* A third case, *Elonis v. US*, involved a specific threat to kill Elonis, the perpetrator's wife, as well as others. *Elonis v. US*, 575 U.S. 723 (2015)  In *Elonis*, the high court stated that the mens rea of the person making the "threat" matters, and of course if the threatening language is purposeful, the courts would be more likely to find that it meets the definition of a true threat.

Here, Anton is merely having a conversation about a concerning event.  A 12 year old student who has never been in this kind of trouble before, he was merely trying to protect himself and his friends by exchanging information with another student who he perceived at the time to be friendly.  As he states in his testimony during the hearing, it was a warning about a rumor—the rumor being the email sent to parents in March. (EXH. A, pp. 21-22, P. 26; Dmitry Affidavit, Exh. H:  Email to Parents Dated March 28, 2023 ["EXH. H"])

Looking at cases that the commissioner has reviewed over the years, attached as a summary in Exh. P and in detail in Exh. Q, the threats have been detailed, specific to a time and place, and directed towards certain individuals (See Dmitry Affidavit, Exh. P: Commissioner Appeals Which Involve Real Threats--Summary ["EXH. P"])and Exh. H: Commissioner Appeals Which Involve Real Threats-Detailed ["EXH. Q"]) which were submitted as "bench briefs" at the hearing)

Further, caselaw outside of New York has shown that courts do not tolerate schools' suppression of free speech, even if makes people uncomfortable.  In *Starbuck v.*

*James City County School Board*, the Fourth Circuit held that Jonathan Starbuck, a high schooler, was allowed to discuss a current event, the Parkland school shootings, with classmates. *Starbuck v. James City County School Board*, 28 F.4th 529 (4th Cir. 2022) The discussion was factual in nature and not intended as a threat. Starbuck was given a two-day out of school suspension. The court ruled this was a violation of Starbuck's free speech rights as there was no substantial disruption at school. See also *J.C. v. Beverly Hills Unified School District,* 711 F.Supp.2d 1094 (2010); Joseph Blocher and Bardia Vaseghi, *True Threats, Self-Defense and the Second Amendment,* The Journal of Law, Medicine & Ethics, 48 S2 (2020)

The catch-all provision that was used to suspend Anton, still requires that the District find the student was a "threat", only this time to safety, health and welfare. In fact, the only thing that the superintendent found Anton guilty of was "saying the words school shooting", which hardly qualifies. (EXH. A, P. 45) The superintendent said nothing about his state of mind, or whether it was a purposeful threat. If the conduct was not a true threat, it was not a threat to safety, health and welfare either, particularly since no weapon was found.

`Anton said he was worried about his and his friends' safety. He found someone he viewed as a neutral party at least in the hallway to talk about what was worrying him. It is understandable he would be on edge after being shown a video of a stabbing in the same bathroom he had just left. Anton's statement was a friendly warning or question, but not a threat. The record should be expunged.

21

CONCLUSION

Anton's rights were violated multiple times, both under state and federal law and local board policy. Violations under the First, Fourth, and Fourteenth Amendments, Section 3214, and board policies of the District were rampant. The Commissioner should order the suspension be overturned, and the record expunged. Based upon the bullying by District personnel and that of J.M., who falsely accused Anton of possessing and displaying a weapon and making a "true threat", then following this up by harassing him via text message, the DASA complaint should be deemed founded. J.M. was a student who had himself been in recent trouble and might have been looking for an "out" or someone else on whom to cast blame, but, in any case, he was not truthful. District personnel might have been frustrated that their original hunch about Anton was wrong, and that people are continuing to talk about the March threat, but that does not mean they should be allowed to pin blame on him for something he did not do. Finally, the family's intradistrict transfer request should be granted.

Respectfully submitted,

/s Suzanne Myron
Suzanne Myron
Attorney for ANTON and DMITRY
PSHENICHNYKH, *Petitioners*
The Law Office of Suzanne Myron
6800 Jericho Turnpike  Suite 120W
Syosset, NY 11791
phone: (516)393-5821

TO:

22

Kenneth Card
Superintendent
o/b/o
East Meadow Union Free School District
718 The Plain Road
Westbury, NY 11590

Office of Counsel
New York State Education Department
State Education Building
89 Washington Avenue
Albany, NY 12234

STATE OF NEW YORK
STATE EDUCATION DEPARTMENT
-----------------------------------------------------------------X
In the Matter of the Application of Anton Pshenichnykh,
an infant under the age of fourteen years, by his father
and natural guardian, DMITRY PSHENICHNYKH,
and Anton, individually,

Petitioners

from the action of
THE BOARD OF EDUCATION OF
THE EAST MEADOW UNION FREE SCHOOL DISTRICT,                    **AFFIDAVIT OF**
                                                              **DMITRY**
Respondents                                                   **PSHENICHNYKH**


regarding the Short and Long-Term Suspensions Imposed
on Anton Under Section 3214 of the Education Law
-----------------------------------------------------------------X
STATE OF NEW YORK        }
COUNTY OF NASSAU         } ss.;


I, Dmitry Pshenichnykh, being duly sworn deposes and states the following under

penalty of perjury:

I am writing to request a waiver of the filing fee of $20, based upon my son's status as

a student attending school in East Meadow under the McKinney-Vento Act.

Also, I am self-employed, working as an independent contractor for Uber and

DoorDash.  My gross pay and wages are $700 and my take-home pay or wages are

$500 per week.  In the past 12 months I have received $25 a month in child support.

I have $100 in cash approximately including checking, savings and cash on hand.  I

finance a 2016 Toyota Camry which is not paid off.  I am behind on the payments

1

and it is danger of being repossessed—see attached Exhibit O to my Affidavit on the

facts of the case.  I am unable to pay the fee for these reasons. Thank you.


Dated: Syosset, New York

August 22 2023

**DMITRY PSHENICHNYKH**

subscribed and sworn to before me this


22 August, 2023

Suzanne Myron
Notary Public, State of New York
No. 02MY6251566
Qualified Nassau County
Commission Expires December 12, 2024